# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

DURRAY MARVELL GARMON,

               Petitioner,

         v.

F. FOULK, Warden

               Respondent.

)
)
)
)
)
)
)
)
)
)
)

Case No. CV 14-0125 JCG

**MEMORANDUM OPINION AND ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS WITH PREJUDICE AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY**

## I.

## INTRODUCTION AND SUMMARY

On December 25, 2013, petitioner Durray Marvell Garmon ("Petitioner"), a California prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus ("Petition" or "Federal Petition").[1] [Dkt. No. 1.] However, the one-year limitation period applicable to Petitioner's federal habeas challenge expired on July 9, 2013. *See* 28 U.S.C. § 2244(d). Accordingly, and for the reasons discussed below, the Court

---

[1] In determining the filing date of a petition, *pro se* prisoners are entitled to the benefit of the "mailbox rule," which dictates that a document's constructive filing date is the date it was presented to prison authorities for mailing to the court. *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (prisoner's notice of appeal deemed filed on the date it was delivered to prison staff for delivery to the court); *Huizar v. Carey*, 273 F.3d 1220, 1223 (9th Cir. 2001) (noting that mailbox rule applies when prisoners file habeas petitions in federal or state court).

dismisses the Petition with prejudice as untimely and declines to issue a certificate of appealability.[2]

## II.

## STATE COURT PROCEEDINGS

On May 27, 2009, Petitioner was convicted of one count of first degree murder, five counts of premeditated attempted murder, and one count of conspiracy to commit murder. (Lodg. No. 21, Clerk's Transcript ("CT") at 458-65.) Additionally, with respect to each count, the jury found true various gang and firearm enhancement allegations. (*Id.*) Petitioner was sentenced to state imprisonment for life without the possibility of parole, plus 185 years to life. (Lodg. No. 22, Reporter's Transcript ("RT") at 585-86.)

Petitioner appealed and, on September 21, 2010, the California Court of Appeal affirmed the conviction in a reasoned decision. (Lodg. Nos. 2-4.) Petitioner did not file a petition for review with the California Supreme Court. (*See* Pet. at 3.)

On November 16, 2010, Petitioner filed a state habeas petition in the California Supreme Court ("Petition No. 1"), which was denied on May 18, 2011. (Lodg. Nos. 5-6.)

On June 15, 2011, Petitioner filed a second state habeas petition in the California Supreme Court ("Petition No. 2"), which was denied on November 16, 2011, with a citation to *In re Clark*, 5 Cal. 4th 750, 767-69 (1993). (Lodg. Nos. 7, 10.)

On December 25, 2011, Petitioner filed a third state habeas petition in the California Supreme Court ("Petition No. 3"), which was denied on July 11, 2012. (Lodg. Nos. 9, 8.)

Petitioner filed a fourth state habeas petition on March 20, 2012 ("Petition No. 4"), and a fifth state habeas petition on July 30, 2012 ("Petition No. 5"), both in

---

[2] Both parties have consented to this Court's authority to enter a final order in this case. [*See* Dkt. No. 16]; *see also* Rule 10 of the Rules Governing Section 2254 Cases in the United States District Courts; 28 U.SC. § 636(c)(1).

1  the Los Angeles County Superior Court.  (Lodg. Nos. 11-12.)  The Superior Court

2  consolidated the actions, and denied both on November 9, 2012.  (Lodg. No. 14.)

3  On November 25, 2012, Petitioned filed a sixth state habeas petition in the

4  California Court of Appeal ("Petition No. 6"), which was denied on February 28, 2013,

5  with citations to *People v. Duvall*, 9 Cal. 4th 464, 474-75 (1995), and *Clark*, 5 Cal. 4th

6  at 765.  (Lodg. Nos. 15-16.)

7  On June 11, 2013, Petitioner filed a seventh state habeas petition in the

8  California Supreme Court ("Petition No. 7"), which was denied on September 11,

9  2013, with a citation to *Clark*, 5 Cal. 4th at 767-69.  (Lodg. Nos. 17-18.)

10  On September 17, 2013, Petitioner filed an eighth state habeas petition in the

11  California Supreme Court ("Petition No. 8"), which was denied on December 18,

12  2013, with another citation to *Clark*, 5 Cal. 4th at 767-69.  (Lodg. Nos. 19-20.)

13  Petitioner filed the Federal Petition on December 25, 2013.

14  On April 23, 2014, Respondent filed a motion to dismiss ("Motion").  [Dkt.

15  No. 13.]  On June 15, 2014, Petitioner filed an opposition ("Opposition").  [Dkt. No.

16  19.]  On July 7, 2014, Respondent filed a reply ("Reply").  [Dkt. No. 20.]

17  **III.**

18  <u>**DISCUSSION**</u>

19  **A.**   <u>**AEDPA's Limitation Period**</u>

20  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal

21  petition for writ of habeas corpus ordinarily must be filed within one year of the date

22  on which the state court judgment becomes "final," *i.e.*, within a year of the conclusion

23  of direct appellate review, or of the expiration of time for seeking such review.  28

24  U.S.C. § 2244(d)(1)(A).

25  This limitation period is tolled during the pendency of properly filed

26  applications for state post-conviction review, such as state habeas petitions.  28 U.S.C.

27  § 2244(d)(2).  In "rare cases," the limitation period is also subject to equitable tolling.

28  *Yeh v. Martel*, 751 F.3d 1075, 1077 (9th Cir. 2014).

**B.**     **Petitioner's Limitation Period**

Under § 2244(d)(1)(A), Petitioner's conviction became final for AEDPA purposes on **November 1, 2010**, *i.e.*, forty days after the Court of Appeal filed its decision affirming Petitioner's conviction.  *See* Cal. R. Ct. 8.264(b)(1), 8.500(e)(1).

However, Petitioner did not file the Petition until December 25, 2013.  (Pet. at 8.)  Thus, the Petition is facially untimely.  *See* 28 U.S.C. § 2244(d)(1)(A).

Accordingly, unless Petitioner is entitled to statutory or equitable tolling, the Petition is untimely.  *See Diaz v. Beard*, 2014 WL 231924, at *1 (S.D. Cal. Jan. 21, 2014).

**C.**     **Statutory Tolling**

AEDPA's limitation period is tolled during the pendency of any "properly filed" application for state collateral review.  28 U.S.C. § 2244(d)(2).  As a rule, a state court's rejection of a habeas petition as untimely signifies that it was not "properly filed" and thus "not entitled to statutory tolling under § 2244(d)(2)."  *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005).

Here, the California Supreme Court denied Petition Nos. 2, 7, and 8 with identical citations to *Clark*, 5 Cal. 4th at 767-69.[3]  (Lodg. Nos. 10, 18, 20.)

Preliminarily, this pinpoint citation to *Clark* indicates that the California Supreme Court denied Petition Nos. 2, 7, and 8 on the grounds that, in those petitions, Petitioner impermissibly challenged his conviction in piecemeal fashion via successive petitions.  *See Clark*, 5 Cal. 4th at 767-69.

Importantly, however, the *Clark* Court explained that "[a] successive petition presenting additional claims that could have been presented in an earlier attack on the judgment is, of necessity, a delayed petition."  *Clark*, 5 Cal. 4th at 770.  That is, under California law, an impermissible successive petition is also, "necess[arily]," an

---

[3]     Curiously, Petitioner concedes that Petition No. 2 was not properly filed, but disputes that conclusion with regard to Petition Nos. 7 and 8.  (*See* Opp. at 1, 4-6.)

4

1 untimely one.[4]  *See id.*  Notably, a contrary rule would enable California state prisoners

2 to toll AEDPA's limitation period at will by filing impermissible successive state

3 petitions.  *Cf. Pace*, 544 U.S. at 413 ("On petitioner's theory, a state prisoner could toll

4 the statute of limitations at will simply by filing untimely state postconviction

5 petitions.  This would turn § 2244(d)(2) into a *de facto* extension mechanism, quite

6 contrary to the purpose of AEDPA, and open the door to abusive delay.").

7 Accordingly, since the California Supreme Court denied Petition Nos. 2, 7,

8 and 8 as impermissible successive petitions, the Court finds that those petitions were

9 untimely under California law, and thus were not "properly filed" for federal statutory

10 tolling purposes.[5]  (*See* Lodg. Nos. 10, 18, 20); *see also Clark*, 5 Cal. 4th at 767-70;

11 *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) ("For tolling to be applied . . . , the

12 petition cannot be untimely or an improper successive petition."); *Bonner v. Carey*,

13 425 F.3d 1145, 1149 (9th Cir. 2005) ("Under *Pace*, if the petition was untimely under

14 California law, it was never properly filed.").

15 Applying these principles, the Court finds that Petitioner's AEDPA limitation

16 period ran for:

17 - **14 days** between the date Petitioner's state court conviction became final
18   (November 1, 2010) and the filing of Petition No. 1 (November 16, 2010); *see*
19   *Porter*, 620 F.3d at 958 (holding that limitation period is not tolled between date
    petitioner's conviction becomes final and filing of first state habeas petition);

20 - **220 days** between the denial of Petition No. 1 (May 18, 2011) and the filing of
21   Petition No. 3 (December 25, 2011); *see Bonner*, 425 F.3d at 1149 ("Under

22

23 [4]     To be sure, California courts sometimes cite a separate pinpoint citation – *Clark*, 5 Cal. 4th
   at 765 – to deny petitions on the grounds of untimeliness.  (*See, e.g.*, Lodg. No. 16.)  However, in
24 light of the *Clark* Court's characterization of impermissible successive petitions as "necess[arily]"
   untimely, 5 Cal. 4th at 770, whether a petition is denied as successive or untimely is "essentially a
25 distinction without a difference" for federal statutory tolling purposes.  *Gonzalez v. Runnels*,
   2008 WL 80744, at *4 (E.D. Cal. Jan. 7, 2008).
26
   [5]     The parties also dispute whether Petition No. 6 was "properly filed."  However, because the
27 timeliness, under California law, of Petition Nos. 2, 7 and 8 is dispositive of the timeliness, under
   federal law, of the Petition, the Court assumes *arguendo* that Petition No. 6 tolled Petitioner's
28 AEDPA limitation period.

*Pace*, if a state court denies a petition as untimely, none of the time before or during the court's consideration of that petition is statutorily tolled.");

- **131 days** following the denial of Petition No. 6 (February 28, 2013); *see id.*

Accordingly, Petitioner had until **July 9, 2013** – *i.e.*, 131 days after the denial of Petition No. 6 on February 28, 2013 – to file a federal habeas petition. *See* 28 U.S.C. § 2244(d)(2).

But Petitioner filed his Petition on December 25, 2013 – more than five months too late.  (Pet. at 8.)

Accordingly, Petitioner's facially untimely Petition is not saved by statutory tolling. *See* 28 U.S.C. § 2244(d)(2).

### D.   Equitable Tolling

As a rule, AEDPA's limitation period is subject to equitable tolling only if Petitioner can show that (1) he pursued his rights diligently and (2) an "extraordinary circumstance prevented timely filing." *Yeh*, 751 F.3d at 1077.

Here, Petitioner alleges that his untimely state filings were delayed by a private investigator's "ongoing investigation into [Petitioner's] ineffective assistance of counsel claim."  (Opp. at 5.)

However, this investigation fails to warrant equitable tolling.

First, Petitioner fails to persuade the Court that his private investigator's open-ended (and apparently fruitless) investigation constitutes an "extraordinary circumstance [that] prevented timely filing." *See Yeh*, 751 F.3d at 1077.  Importantly, "[a]ll prisoners who raise fact-based habeas claims must undertake, to some extent, an investigation into . . . the available facts that support their claims." *Frize v. Marshall*, 2008 WL 4861521, at *6 (C.D. Cal. Oct. 30, 2008); *see also Miranda v. Castro*, 292 F.3d 1063, 1065 (9th Cir. 2002) ("[T]he threshold necessary to trigger equitable tolling under AEDPA is very high, lest the exceptions swallow the rule.") (internal brackets omitted).  Moreover, Petitioner fails to explain *how* this investigation *caused* his delay. *See Thurston v. Yates*, 471 F. App'x 619, 620 (9th Cir. 2012) ("[T]here must be a

6

causal link between the extraordinary circumstances and the inability to file a timely petition.")

Second, Petitioner fails to establish that he "pursued his rights diligently." *See Yeh*, 751 F.3d at 1077. Notably, the private investigator "was not hired until after [Petition No. 1] was . . . decided," and – according to an "investigation summary" submitted with Petition No. 8 – the investigator merely "[wrote] letters to [two potential witnesses] to obtain their side of the story." (Opp. at 5; Lodg. No. 19, Ex. O.) Petitioner fails to explain either (1) how such belated, minimal efforts necessarily delayed his Federal Petition, or (2) why Petitioner could not have sent such letters himself, years earlier.

Accordingly, the Court concludes that Petitioner is not entitled to equitable tolling, his one-year limitation period expired on July 9, 2013, and the Petition is untimely. *See* 28 U.S.C. § 2244(d); *Yeh*, 751 F.3d at 1077.

## E.   Actual-Innocence Gateway

Finally, Petitioner purports to assert his "actual innocence" of the offenses of which he was convicted. (Pet. Attachment A at 1; Opp. at 6.)

As a rule, in "rare" cases, a petitioner's claim of "actual innocence" may "serve[] as a gateway through which a petitioner may pass," notwithstanding the expiration of AEDPA's one-year limitation period. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). When claiming actual innocence, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). To succeed, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in . . . light of the new evidence." *Id.* at 327.

Petitioner fails to make such a showing here.

//

//

1

              1.    <u>Evidence of Petitioner's Guilt</u>

2

      Preliminarily, the Court takes note of certain highly compelling evidence of

3 Petitioner's guilt.  Significantly, after his arrest, Petitioner repeatedly acknowledged

4 that he was the driver in a fatal, gang-related drive-by shooting.  (*See* CT at 360-67

5 (compiling Petitioner's inculpatory statements to detectives); *id.* at 299 ("But see they

6 got me – I was the driver."); *id.* at 303 ("[T]hey can get me as an accessory because I

7 was driving."); *id.* at 355 ("I wasn't shooting.  But I was driving.")); *see also Arizona*

8 *v. Fulminante*, 499 U.S. 279, 296 (1991) (noting that a "defendant's own confession is

9 probably the most probative and damaging evidence that can be admitted against

10 him").

11

      In his Opposition, Petitioner argues that his initial confession to detectives was a

12 "product of coercion," [6] and generally claims that his other admissions – made during

13 surreptitiously recorded jailhouse exchanges – were, in fact, "selective[]" quotes from

14 conversations in which Petitioner "was merely rehashing his interview with

15 detectives."  (Opposition at 8-9.)

16

      Petitioner's gloss is unpersuasive.  As the Los Angeles County Superior Court

17 cogently observed in its ruling on Petition No. 5, Petitioner's admissions "displayed

18 intimate knowledge" of the crime and of "how [it was] committed," and thus

19 constituted "compelling evidence of his guilt."  (Lodg. No. 14 at 2.)  Moreover, the

20 Court cannot see – and Petitioner fails to specifically explain – how the following

21 admissions might be interpreted as anything but candid acknowledgments of guilt:

22

                But they can't do nothing.  Really do nothing to me.  *But they can*

23                 *get me as an accessory because I was driving.*

24

25

26

27

28

---

[6]      On direct appeal, Petitioner argued that his statements to detectives were involuntary and therefore inadmissible.  (Lodg. No. 4 at 7; 2010 WL 3636725, at *4.)  The Court of Appeal examined the "totality of the circumstances" and concluded that Petitioner's "will was not overborne" and, therefore, that "[Petitioner's] statements were voluntary."  (Lodg. No. 4 at 8; 2010 WL 3636725, at *5.)  Regardless, a district court considering a claim of actual innocence "is not bound by the rules of admissibility that would govern at trial."  *Schlup*, 513 U.S. at 327.

[...]

I wasn't shooting. *But I was driving*.

(CT at 303, 355 (emphasis added).)

Against this backdrop, the Court considers the "newly discovered evidence" submitted by Petitioner.

### 2.    Petitioner's New Evidence

In support of his actual-innocence claim, Petitioner relies on the sworn statement ("Affidavit") of his co-conspirator, Eric Byrd ("EB").  (Lodg. No. 19, Ex. C.)

Therein, EB represents that Petitioner was "convicted for a crime that [EB] committed on or near the month of February 2006."  (Aff. at 1.)  However, contrary to what this statement would logically suggest, EB does not claim to have been the actual perpetrator of Petitioner's crime – that is, the *driver* during the fatal drive-by shooting. (*See id.*)  Rather, EB confesses that he was a *gunman*.  (*Id.*)

More relevantly, EB also purports to recall that the driver was not Petitioner, but rather Marquis Byrd ("MB").[7]  (*Id.*)

The Court finds the Affidavit unreliable for three reasons:

- No Credible Explanation for Incriminating MB: First, EB's stated reason for drafting the Affidavit and incriminating MB is unconvincing:

    I'm confessing I was involved [in the shooting] and that Mr. Durray
    Garmon was not my driver[.]  It was Mr. Marquis Byrd.  I'm
    willing to testify in order to correct this incorrect conviction that
    placed Mr. Durray Garmon behind bars.  Due to my imprisonment
    I have converted my life over to Christianity which requires me to
    confess my sins.

(Aff. at 1.)  Even if EB's stated reason for publicly confessing his *own* sins were accepted, it fails to explain his motivation for incriminating *MB*.  For example, on the same day Petitioner was first questioned, EB admitted to police "that he was present at the time of the shooting and was seated in the back seat."  (Opp. at 10.)  That is, from the moment of Petitioner's arrest, EB could have identified

---

[7]    EB and MB are not related.

9

MB as the driver – thereby exonerating Petitioner – without accepting any further "blame for [EB's own] actions." (*See* Aff. at 2.)

Thus, the Court does not credit EB's stated reason for identifying MB as the driver now, and consequently finds the Affidavit to be less than reliable.

- No Satisfactory Explanation for Delay: Second, the Court finds the Affidavit unreliable because it emerged more than *five years* after the shooting, "with no *satisfactory* explanation given as to why [EB] waited so long to come forward." [8] *Cotton v. Schriro*, 360 F. App'x 779, 780 (9th Cir. 2009) (internal quotation marks, brackets, and ellipsis omitted) (emphasis added).

- Nothing to Lose: Third, the Court notes that on November 29, 2011 – the date on which EB purportedly drafted the Affidavit – EB had recently been sentenced to 50 years to life in state prison for first degree murder.[9] Thus, EB had little disincentive to lie about his role in the drive-by shooting, and "nothing to lose" by untruthfully implicating MB. *Cf. Morris v. Hill*, --- F. App'x ----, 2015 WL 1021120, at *2 (9th Cir. Mar. 10, 2015) ("While a credible confession by the actual perpetrator may affirmatively demonstrate actual innocence," a felon serving a life sentence has "nothing to lose by confessing."); *Smith v. Baldwin*, 510 F.3d 1127, 1141 (9th Cir. 2007) (noting that declarant was "serving a life term in prison" and thus "face[d] almost no consequences for lying").

Thus, in consideration of (1) EB's purported reason for drafting the Affidavit, (2) EB's inexplicable delay in exonerating Petitioner, and (3) EB's lack of disincentive to falsely implicate MB, the Court finds that the Affidavit is not a "*trustworthy* eyewitness account[]" of the crime in question.[10] *See Schlup*, 513 U.S. at 324 (emphasis added).

---

[8]    Notably, EB felt compelled to come forward while he was incarcerated at the same facility as Petitioner. (*See* Lodg. No. 12 ("This confession was [personally] given to Petitioner when [EB] was on D-Yard of High Desert State Prison. [EB] has since moved to C-Yard.").)

[9]    EB was convicted (in connection with a wholly separate crime) on February 28, 2011. *See* http://appellatecases.courtinfo.ca.gov/search/case/trialCourt.cfm?dist=2&doc_id=1972518&doc_no= B231350; *People v. Byrd*, 2012 WL 4335439 (Cal. Ct. App. 2d Dist. Sept. 24, 2012) (affirming conviction).

[10]    In light of the Affidavit's notable weaknesses, the Court, in its discretion, declines to hold an evidentiary hearing. *See, e.g.*, *Howard v. Holland*, 2014 WL 3404975, at *11, 14 (C.D. Cal. May 30, 2014) (finding declaration of alibi witness to be unreliable without holding evidentiary hearing).

Accordingly, the Court finds that Petitioner has failed to present "new reliable evidence" in support of his actual-innocence claim. *See id.*

### 3. "Reasonable Juror" Analysis

Because Petitioner has failed to satisfy his burden under *Schlup*, he is not entitled to pass through the "actual-innocence gateway," and the Petition must be dismissed as untimely. *See McQuiggin*, 133 S. Ct. at 1928.

Nevertheless, the Court considers the Affidavit in the context of the evidence presented at trial, in order to "assess how reasonable jurors would react to the overall, newly supplemented record." *House v. Bell*, 547 U.S. 518, 538 (2006).

Notably, Petitioner draws the Court's attention to two pieces of trial evidence, which, Petitioner claims, bolster the Affidavit and establish his innocence:

- MB's Fingerprints: First, in an effort to corroborate EB's version of events, Petitioner emphasizes that police found MB's fingerprints on the driver-side door of the drive-by vehicle. (Pet. Attachment A at 2; Opp. at 8.) However, at trial, a detective testified that MB was "eliminated as a suspect" once MB explained "how his prints got on that vehicle." (RT at 316.) Other trial evidence – namely, a statement made by Petitioner during a jailhouse conversation – strongly suggests the explanation:

  > See my prints didn't come up. . . . But a [*guy*] that helped me steal it . . . , his prints is in it. But he – he – he a minor.[11]

  (CT at 312.) At closing, the prosecution logically connected Petitioner's statement to the physical evidence to reach a reasoned conclusion: MB's prints were on the vehicle because MB had helped Petitioner steal it. (RT at 525-26.) Tellingly, Petitioner fails to address this compelling, alternate explanation for the fingerprint evidence.

- Eyewitness Testimony: Next, Petitioner highlights the trial testimony of eyewitness Julio Serrano, who initially identified Petitioner as the driver, but could not confirm the identification at trial. (RT at 161-162, 166.) However, contrary to Petitioner's account, Serrano did *not* testify that "Petitioner was not the person he saw driving." (*See* Opp. at 7.) Rather, Serrano merely

---

[11] While Petitioner does not identify MB by name, MB was indeed a minor at the time of the shooting. (*See* Lodg. No. 19, Ex. B.)

acknowledged – at the prodding of Petitioner's trial counsel – that "it was dark" and that he had "turned away quickly," thus leaving him unable to confirm the driver's identity.  (RT at 164-65.)  As such, Serrano's testimony, taken as a whole, does not strike the Court as either harmful or helpful to Petitioner.

In sum, the Affidavit and the fingerprint evidence – considered in isolation – may support a counter-narrative about the real perpetrator of Petitioner's crimes.  But the probative value of this evidence is dramatically outweighed by that of Petitioner's repeated, unambiguous acknowledgements of guilt.  (*See, e.g.*, CT at 355 ("I wasn't shooting.  But I was driving.").)

Thus, viewing the record as a whole, the Court cannot find that "it is more likely than not that no reasonable juror would have convicted [Petitioner] in . . . light of the new evidence."  *Schlup*, 513 U.S. at 327.

### F.   Certificate of Appealability

Additionally, for the reasons stated above, the Court finds that Petitioner has not shown that "jurists of reason would find it debatable whether":  (1) "the petition states a valid claim of the denial of a constitutional right"; *and* (2) "the district court was correct in its procedural ruling."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Thus, the Court declines to issue a certificate of appealability.

//
//
//
//
//
//
//
//
//
//

## IV.

## ORDER

For the foregoing reasons, **IT IS ORDERED THAT**:

1.      The Motion be **GRANTED**;

2.      The Petition be **DISMISSED WITH PREJUDICE**;

3.      A Certificate of Appealability be **DENIED**; and

4.      Copies of this Order be **SERVED** on the parties.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:   March 30, 2015            _____

                                   HON. JAY C. GANDHI
                                   UNITED STATES MAGISTRATE JUDGE

13